In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3316

JEFFREY ALLEN ROWE,

*Plaintiff-Appellant,*

*v.*

MONICA GIBSON, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-00975-SEB-DKL — **Sarah Evans Barker**, *Judge.*

SUBMITTED MAY 26, 2015 — DECIDED AUGUST 19, 2015

Before POSNER, ROVNER, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* An Indiana prison inmate named Jeffrey Rowe, the plaintiff in this suit under 42 U.S.C. § 1983, charges administrators and prison staff (actually employees of Corizon, Inc., which provides medical services to the inmates at Pendleton Correctional Facility, Rowe's prison) with deliberate indifference to a serious medical need—that is, with *knowing* of a serious risk to inmate health or safety but responding ineffectually (as by departing substantially

from accepted professional judgment) or not at all. See, e.g., *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008). Such conduct was held in *Farmer* to violate the cruel and unusual punishments clause of the Eighth Amendment, deemed applicable to state action by interpretation of the due process clause of the Fourteenth Amendment. Rowe charges gratuitous infliction of physical pain and potentially very serious medical harm—cogent examples of cruel and unusual punishment. He has a subsidiary claim of having been retaliated against for filing this lawsuit, a claim we discuss briefly toward the end of our opinion. The district judge granted summary judgment in favor of the defendants on both claims, dismissing Rowe's suit and precipitating this appeal.

In 2009, already an inmate at Pendleton, Rowe was diagnosed with reflux esophagitis, also known as gastroesophageal reflux disease (GERD). See National Institutes of Health, "Gastroesophageal reflux disease," www.nlm.nih.gov/medlineplus/ency/article/000265.htm (visited August 17, 2015, as were the other websites cited in this opinion). The Mayo Clinic explains that "a valve-like structure called the lower esophageal sphincter usually keeps the acidic contents of the stomach out of the esophagus. If this valve opens when it shouldn't or doesn't close properly, the contents of the stomach may back up into the esophagus (gastroesophageal reflux). … [GERD] is a condition in which this backflow of acid is a frequent or ongoing problem. A complication of GERD is chronic inflammation and tissue damage in the esophagus." *Mayo Clinic*, "Diseases and Conditions, Esophagitis: Reflux Esophagitis," www.mayoclinic.org/diseases-conditions/esophagitis/basics/causes/con-20034313. As we explained in a recent case in which, as in this case, a prison

inmate complained of failure to treat his GERD (and we reversed the grant of summary judgment in favor of the prison staff), "GERD can … produce persistent, agonizing pain and discomfort. It can also produce 'serious complications. Esophagitis can occur as a result of too much stomach acid in the esophagus. Esophagitis may cause esophageal bleeding or ulcers. In addition, a narrowing or stricture of the esophagus may occur from chronic scarring. Some people develop a condition known as Barrett's esophagus. This condition can increase the risk of esophageal cancer.' *WebMD*, *Heartburn/GERD Health Center*, "What Are the Complications of Long–Term GERD?" www.webmd. com/heartburn–gerd/guide/reflux–disease–gerd–1?page=4." *Miller v. Campanella*, 2015 WL 4523799, at *2 (7th Cir. July 27, 2015). Rowe complains of pain based on neglect of his need for symptomatic relief; continued neglect will endanger him more profoundly.

The prison physician who diagnosed Rowe with GERD told him to take a 150-milligram Zantac pill twice a day. Zantac inhibits the production of stomach acid and is commonly used to treat esophagitis (as we'll abbreviate the name of Rowe's disease). Although technically "Zantac" is merely the trade name for ranitidine manufactured by GlaxoSmithKline (in prescription strengths) and Boehringer Ingelheim (in over-the-counter strengths), it is often used as a synonym for ranitidine, see *Wikipedia*, "Ranitidine," http:// en.wikipedia.org/wiki/Ranitidine, because Glaxo was the first, and remains the best-known, manufacturer. "Zantac" is the only word for the drug that appears in the briefs, and so we too will call the drug that Rowe received "Zantac."

After the diagnosis Rowe was given Zantac pills and was permitted to keep them in his cell and take them when he felt the need to. This regimen continued for more than a year. But in January 2011 his pills were confiscated and he was told that he would be allowed to take a Zantac pill only when a prison nurse gave it to him, and that would be at 9:30 a.m. and then at 9:30 p.m. He complained that he needed to take Zantac with his meals, which were, oddly enough, scheduled by the prison for 4 a.m. and 4 p.m. (why these times, we are not told). The prison had decided that inmates such as Rowe who take psychiatric medications should not be allowed to keep any pills in their cells—yet the head of health care at the prison told Rowe that he could keep in his cell (and thus take whenever he wanted) any Zantac pills that he bought at the prison commissary—which, however, as we're about to see, he couldn't afford. No reason has been articulated for forbidding him to keep Zantac given him by prison staff while permitting him to keep Zantac that he bought at the commissary and take it whenever he needs to in order to prevent or alleviate pain. There is no suggestion that Zantac is a narcotic or otherwise consumed for nonmedical as well as medical reasons.

The defendants question Rowe's inability to pay for the pills. They point out that in one 13-month period he spent approximately $60 at the commissary. But the prison commissary charges $3.28 for just four 75-mg Zantac pills (and recall that Rowe was to take two 150-mg pills daily), meaning that he would have to pay almost $1300 for a 13-month supply. And he was forbidden to buy more than eight days' worth of Zantac a month from the commissary, which was only about a quarter of the amount that he needed.

To continue the narrative of what seems a senseless series of decisions by the prison's medical staff, as well as heartless given what the staff knew about the disease and Rowe's continuous claims of severe pain: at the beginning of July 2011, a month after he filed suit, he ceased receiving Zantac because his "prescription" (that is, his authorization to receive over-the-counter Zantac free of charge on a continuing basis) had lapsed. He made a series of requests for the drug beginning on July 3, but the nurse defendants denied all of them because he had no prescription. When he complained he was told by the administrative director of the medical staff: "Your chronic care condition does not warrant the continued use of Zantac. The continual use of over-the-counter medications can create further health problems in many instances. You will have to purchase this off of commissary if you wish to continue taking it." Notice the contradiction (illustrating the run around to which Rowe was continually subjected) in denying Rowe free Zantac because it could create "further health problems" but permitting him to buy and use it at will, though he couldn't afford to buy it. Nor is there any suggestion that Zantac is one of the over-the-counter medications that can create health problems if taken daily for a protracted period of time. And finally, if over-the-counter medicines are to be barred, why wasn't Rowe given a prescription for 300-mg Zantac pills; these are not only prescription rather than over-the-counter drugs but one such pill a day may be sufficient to control one's GERD, compared to two or more when an over-the-counter strength Zantac is prescribed.

On July 13, 2011, in response to Rowe's continued requests for a renewed prescription for Zantac, a physician who works at the prison (though employed by Corizon)

named William H. Wolfe, whose professional specialty is preventive medicine, about which see *American College of Preventive Medicine: Physicians Dedicated to Prevention*, www.acpm.org/, rather than gastroenterology, see *healthgrades*, "Dr. William H. Wolfe, MD.," www.health grades.com/physician/dr-william-wolfe-2fgkl/background-check, and who is a frequent defendant in prisoner civil rights suits, reviewed Rowe's medical records and opined that his condition didn't require Zantac at all—this despite the fact that Rowe had been continuously prescribed Zantac for almost two years and that Wolfe himself had been the prescribing doctor for a quarter of that period. But though initially refusing to provide a new prescription for Zantac, Wolfe later relented and on August 2 prescribed it though he later stated in an affidavit that he had done so as a "courtesy" to Rowe and not out of medical necessity. (Prescribing drugs for prison inmates as a "courtesy" seems very odd; it is not explained.) The upshot was that Rowe had no access to Zantac for more than a month (between July 1 and August 3)—a significant deprivation. Even after Zantac was restored to him, he continued to be allowed to take it only at 9:30 a.m. and 9:30 p.m., both times being many hours distant from his meals.

In another affidavit Wolfe stated that "it does not matter what time of day Mr. Rowe receives his Zantac prescription. Each Zantac pill is fully effective for twelve hour increments. Zantac does not have to be taken before or with a meal to be effective." However, according to Boehringer Ingelheim, the manufacturer of over-the-counter Zantac, while Zantac can be taken at any time "to relieve symptoms," in order "to prevent symptoms" it should be taken "30 to 60 minutes be-fore eating food or drinking beverages that cause heart-

burn." *Zantac*, "Maximum Strength Zantac 150," www.zan tacotc.com/zantac-maximum-strength.html#faqs, and this advice is repeated on the labels of the boxes in which over-the-counter Zantac is sold. Were Zantac equipotent whenever taken, the manufacturer would not tell consumers to take it 30 to 60 minutes before eating, for having to remember when to take a pill adds a complication that the consumer would rather do without. There is thus no reason for the manufacturer to be lying, and it would be absurd to think that Dr. Wolfe, a defendant who is not a gastroenterologist, knows more about treatment of esophagitis with Zantac than the manufacturer does.

Rowe's aim was pain prevention, so having to take Zantac six and a half hours before a meal did not do the trick. It left him in pain for five and a half hours during and after the meal, until he got his next Zantac pill. Wolfe's statement that "each Zantac pill is fully effective for twelve hour increments" is also contradicted by the Zantac website, which states that one 150-mg pill "lasts *up to* 12 hours" (emphasis added). Thus a pill taken six and half hours before a meal might not be effective in alleviating the pain caused by acid secretions stimulated by the meal.

It might be thought that a corporate website, such as that of the Zantac manufacturer, would be a suspect source of information. Not so; the manufacturer would be taking grave risks if it misrepresented the properties of its product. In any event, the Mayo Clinic's website, as we'll see in a moment, confirms the manufacturer's claims.

Wolfe's affidavit states that Rowe was complaining just of "alleged heartburn [that] was not a serious medical condition warranting a prescription for Zantac"—but if so why

did he prescribe Zantac for Rowe during the very period in which, according to the affidavit, Rowe's condition was not serious? (The affidavit fails to mention that it was Wolfe who had prescribed Zantac for Rowe, but that's conceded.)

It's true that the Mayo Clinic's website, at "Drugs and Supplements: Histamine H2 Antagonist (Oral Route, Injection Route, Intravenous Route)," www.mayoclinic. org/drugs-supplements/histamine-h2-antagonist-oral-route-injection-route-intravenous-route/proper-use/drg-20068584, after listing various drugs (including ranitidine) for treatment of the cluster of ailments that includes esophagitis, states that "for this class of drugs … patients taking two doses a day are instructed: 'Take one in the morning and one before bedtime.'" But this dosing, Mayo goes on to state, is appropriate "only for patients taking the prescription strengths of these medicines." The 150-mg pills that Rowe was taking are available over the counter; a prescription is required only for the 300-mg version. Both the Boehringer Ingelheim and Mayo websites also say that the patient shouldn't take Zantac for more than two weeks unless directed by a doctor—but Rowe was of course directed by Wolfe, as well as by other doctors earlier, to take Zantac on a continuing basis.

Not only wasn't Rowe allowed to take Zantac with his meals; he was not, as the Mayo website recommends, allowed to take it with water a half hour or an hour before eating a meal or drinking beverages that might cause him esophageal pain. As the Mayo website explains,  for "adults and teenagers—150 mg with water taken *thirty to sixty minutes before eating a meal* or drinking beverages you expect

to cause symptoms. Do not take more than 300 mg in twenty-four hours" (emphasis added).

Stomach acid is of course integral to the digestion of food, and indeed thirty percent of total gastric acid secretion is stimulated by the anticipation, smell, and taste of food, before the food ever reaches the stomach. Thomas A. Miller, *Modern Surgical Care: Physiologic Foundations and Clinical Applications* 344-45 (2006). "The foods you eat affect the amount of acid your stomach produces," and "many people with GERD find that certain foods trigger their symptoms." *Healthline*, "Diet and Nutrition for GERD," www.healthline. com/health/gerd/diet-nutrition#Overview1. So it is no surprise that Rowe experiences painful symptoms when he eats without having been allowed to take a Zantac pill shortly before the meal.

The *Physicians' Desk Reference*, "PDR Search: Full Prescribing Information: Zantac 150 and 300 Tablets," www. pdr.net/full-prescribing-information/zantac-150-and-300-tabl ets?druglabelid=241, states that a 150-mg dose of Zantac inhibits 79 percent of food-stimulated acid secretion for up to three hours after it's taken. This implies that the drug's efficacy decreases over time and so supports Rowe's claim that a 150-mg dose does not suppress his food-stimulated acid secretions when taken six and a half hours before a meal. The *Physicians' Desk Reference* also says that "symptomatic relief commonly occurs within 24 hours after starting therapy with ZANTAC 150 mg twice daily," which could be misread to mean that it does not matter what time of day the pills are taken, but which actually means that it takes a day for the body to recognize Zantac as a source of relief from esophageal distress. This interpretation is confirmed by

Mayo, which states (at the website cited earlier): "It may take several days before this medicine begins to relieve stomach pain."

The evidence that Rowe was in pain for five and a half hours after eating is his repeated attestation—in his verified federal complaint and his declarations—that he experienced pain for that length of time when he was not allowed to take Zantac with or shortly before his meals. For purposes of summary judgment his attestations of extreme pain must be credited. See 28 U.S.C. § 1746; Fed. R. Civ. P. 56(c). There was no plausible contrary evidence. The affidavits of the only expert witness on the proper times at which to take Zantac, defendants' witness Wolfe, were highly vulnerable. Wolfe is not a gastroenterologist. He says that Rowe didn't need Zantac yet prescribed Zantac for him. He opined with confidence about what Rowe needed or didn't need—yet never examined him—and offered no basis for his off-the-cuff medical opinion. A court should not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); see also *Finn v. Warren County*, 768 F.3d 441, 452 (6th Cir. 2014) ("the 'knowledge' requirement of Rule 702 requires the expert to provide more than a subjective belief or unsupported speculation"); *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("we look to the basis of the expert's opinion, and not the bare opinion alone. A claim cannot stand or fall on the mere ipse dixit of a credentialed witness"); *McClain v. Metabolife International Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005).

Remember that Rowe had been diagnosed with esophagitis back in 2009 and that for the ensuing two years physi-

cians had prescribed Zantac to treat his condition. Furthermore, the Indiana Department of Correction permits such continuous treatment only to treat a *serious* health condition, so presumably the prescribing physicians thought Rowe's condition serious. None of this evidence or inference is undermined by Dr. Wolfe's evidence.

A member of a prison's staff is deliberately indifferent and thus potentially liable to an inmate if he "knows of and disregards an excessive risk to inmate health," *Williams v. O'Leary*, 55 F.3d 320, 324 (7th Cir. 1995), quoting *Farmer v. Brennan*, *supra*, 511 U.S. at 837; see also *Miller v. Campanella*, *supra*, at *2. Rowe makes two distinct claims of deliberate indifference; the evidence that we've reviewed tends to substantiate both. There is both evidence that defendants Wolfe, Deborah Dotson, Melissa Bagienski, Chris Deeds, and Lisa Gibson were deliberately indifferent to his pain when they denied him access to free Zantac for thirty-three days, and that defendants Mary Mansfield, Gibson, and Dr. Michael Mitcheff were deliberately indifferent to his pain when they insisted—for many months—on giving him Zantac only at 9:30 a.m. and 9:30 p.m., instead of at his prescribed mealtimes. Regarding the first claim, if the nurse defendants to whom Rowe complained about reflux pain were not authorized to give him the free Zantac they should have promptly referred the matter to a doctor.

The evidence of Wolfe's deliberate indifference to Rowe's pain and resulting need for Zantac is, as we've shown, substantial, and likewise the evidence that limiting Rowe's taking Zantac to 9:30 a.m. and 9:30 p.m. for a protracted period exhibited deliberate indifference to a serious medical need. Wolfe never told anyone, so far as appears, when would be

the best times for administering Zantac to Rowe. In very large doses Zantac will remain in your blood stream long enough to affect the stomach acid produced by meals eaten many hours later, but the Mayo and Boehringer Ingelheim timing recommendations suggest that this isn't true for 150-mg doses. Wolfe's assertion that "it does not matter what time of day Mr. Rowe receives his Zantac prescription" is implausible as well as vigorously contested. Rowe's pain and the Mayo Clinic's timing recommendations suggest that giving 150-mg doses of Zantac five and a half hours after one meal and six and a half hours before the next (and only other) meal of the day may be a substantial departure from accepted professional practice, preventing summary judgment for defendants regarding Rowe's claim of deliberate indifference to avoidable pain caused by the timing of his medication. See *Sain v. Wood, supra*, 512 F.3d at 894–95. Since Rowe's pain strongly indicated that he was experiencing reflux, the reflux could have had serious medical consequences (up to and including cancer) in addition to inflicting chronic pain on him. Prisoners aren't supposed to be tortured.

In citing even highly reputable medical websites in support of our conclusion that summary judgment was premature we may be thought to be "going outside the record" in an improper sense. It may be said that judges should confine their role to choosing between the evidentiary presentations of the opposing parties, much like referees of athletic events. But judges and their law clerks often conduct research on cases, and it is not always research confined to pure issues of law, without disclosure to the parties. We are not like the English judges of yore, who under the rule of "orality" were not permitted to have law clerks or other staff, or libraries, or

even to deliberate—at the end of the oral argument in an appeal the judges would state their views *seriatim* as to the proper outcome of the appeal.

We don't insulate judges like that, but we must observe proper limitations on judicial research. We must acknowledge the need to distinguish between judicial web searches for mere background information that will help the judges and the readers of their opinions understand the case, web searches for facts or other information that judges can properly take judicial notice of (such as when it became dark on a specific night, a question we answered on the basis of an Internet search in *Owens v. Duncan*, 781 F.3d 360, 362 (7th Cir. 2015), citing *WeatherSpark*, "Average Weather On September 22 For Chicago, Illinois, USA: Sun," https://weather spark.com/averages/30851/9/22/Chicago-Illinois-United-Stat es), and web searches for facts normally determined by the factfinder after an adversary procedure that produces a district court or administrative record. When medical information can be gleaned from the websites of highly reputable medical centers, it is not imperative that it instead be presented by a testifying witness. Such information tends to fall somewhere between facts that require adversary procedure to determine and facts of which a court can take judicial notice, but it is closer to the second in a case like this in which the evidence presented by the defendants in the district court was sparse and the appellate court need only determine whether there is a factual dispute sufficient to preclude summary judgment.

Rule 201 of the Federal Rules of Evidence makes facts of which judicial notice is properly taken conclusive, and therefore requires that their accuracy be indisputable for judicial

notice to be taken of them. We are not deeming the Internet evidence cited in this opinion conclusive or even certifying it as being probably correct, though it may well be correct since it is drawn from reputable medical websites. We use it only to underscore the existence of a genuine dispute of material fact created in the district court proceedings by entirely conventional evidence, namely Rowe's reported pain.

There is a high standard for taking judicial notice of a fact, and a low standard for allowing evidence to be presented in the conventional way, by testimony subject to cross-examination, but is there no room for anything in between? Must judges abjure visits to Internet web sites of premier hospitals and drug companies, not in order to take judicial notice but to assure the existence of a genuine issue of material fact that precludes summary judgment? Are we to forbear lest we be accused of having "entered unknown territory"? This year the bar associations are busy celebrating the eight hundredth anniversary of Magna Carta. The barons who forced King John to sign that notable document were certainly entering unknown territory, and risking their lives to boot. Shall the unreliability of the unalloyed adversary process in a case of such dramatic inequality of resources and capabilities of the parties as this case be an unalterable bar to justice? Must our system of justice allow the muddled affidavit of a defendant who may well be unqualified to be an expert witness in this case to carry the day against a pro se plaintiff helpless to contest the affidavit?

This is not the case in which to fetishize adversary procedure in a pure eighteenth-century form, given the inadequacy of the key defense witness, Dr. Wolfe. Let's review: Wolfe refused to continue Rowe's Zantac prescription in July 2011

while Rowe was being kept waiting for three weeks before being seen by a doctor. Wolfe knew Rowe had esophagitis: he reviewed Rowe's medical records, which contained the 2009 diagnosis and revealed nearly two years of physicians' having prescribed Zantac for him continuously. Wolfe had *personally* prescribed Zantac for Rowe for six months of those two years and must have known that the Department of Correction authorizes such treatment only for a *serious* health condition. Rowe was complaining of continuing reflux pain; and while Wolfe denied a prescription renewal on July 13, he demonstrated his awareness that Rowe might need treatment by scheduling him for a later appointment (the August 2 appointment) to evaluate his request to resume taking Zantac.

Against this background, to credit Wolfe's evidence that it doesn't matter when you take Zantac for relief of GERD symptoms (evidence that may well have failed to satisfy the criteria for the admissibility of expert evidence that are set forth in Fed. R. Evid. 702) just because Rowe didn't present his own expert witness would make no sense—for how could Rowe find such an expert and persuade him to testify? He could not afford to pay an expert witness. He had no lawyer in the district court and has no lawyer in this court; and so throughout this litigation (now in its fourth year) he has been at a decided litigating disadvantage. He requested the appointment of counsel and of an expert witness to assist him in the litigation, pointing out sensibly that he needed "verifying medical evidence" to support his claim. The district judge denied both requests, leaving Rowe unable to offer evidence beyond his own testimony that he was in extreme pain when forbidden to take his medication with his meals.

The web sites give credence to Rowe's assertion that he was in pain. But the information gleaned from them did not *create* a dispute of fact that was not already in the record. Rowe presented enough evidence to call Dr. Wolfe's assessment into question—Rowe claims that after his medication was switched to the 12-hour schedule he was in extreme pain and Dr. Wolfe, without examining Rowe or disclosing the basis for his opinion (as we require experts to do), stated cursorily that the medicine would be effective for 12 hours. It will be up to the factfinder to decide, on a better developed record, who is right.

Nor is pain the only concern. Esophageal reflux disease can lead to serious damage of the stomach or esophagus, and even to cancer.

It is heartless to make a fetish of adversary procedure if by doing so feeble evidence is credited because the opponent has no practical access to offsetting evidence. To say for example that however implausible Dr. Wolfe's evidence is, it must be accepted because not contested, is to doom the plaintiff's case regardless of the merits simply because the plaintiff lacks the wherewithal to obtain and present conflicting evidence. Rowe did not move to exclude Wolfe as an expert witness on the ground that Wolfe neither qualified to give expert evidence in this case (because he is not a gastroenterologist) nor, as a defendant, was likely to be even minimally impartial. But Rowe does not have the legal knowledge that would enable him to file such a motion.

We have decided to reverse the judgment. We base this decision on Rowe's declarations, the timeline of his inability to obtain Zantac, the manifold contradictions in Dr. Wolfe's affidavits, and, last, the cautious, limited Internet research

that we have conducted in default of the parties' having done so. We add that the judge erred not only by giving undue weight to Wolfe's internally contradictory affidavit but also by relying on a defendant (Wolfe) as the expert witness. There are expert witnesses offered by parties and neutral (court-appointed) expert witnesses, but *defendants* serving as expert witnesses?—and in cases in which the plaintiff doesn't have an expert witness because he doesn't know how to find such a witness and anyway couldn't afford to pay the witness? And how could an unrepresented prisoner be expected to challenge the affidavit of a hostile medical doctor (in this case *really* hostile since he's a defendant in the plaintiff's suit) effectively? Is *this* adversary procedure?

Esophagitis is a common disease for which Zantac is a common treatment, and it makes common sense as well as medical sense that a drug for treating symptoms of stomach acid backing up into the esophagus would be administered shortly before or shortly after meals unless the massive 300-mg pill was being administered to the patient, and it was not in this case. Rowe claimed that the Zantac he took became ineffective in treating his esophagitis pain symptoms when the prison staff decided to give it to him only long before his meals. His pain and the timing recommendation of the Mayo Clinic that we mentioned earlier suggest that giving 150-mg doses of Zantac six and a half hours before and five and a half hours after meals may be a substantial departure from accepted professional practice. But without his own expert, Rowe couldn't counter Wolfe's assertion that Zantac does not need to be taken shortly before, or with or shortly after, a meal in order to be effective. As Rowe explained in his brief, while he "provided evidence that Zantac does not 'prevent' reflux during its 12 hours of effectiveness, and that it was

not effective at relieving Rowe's symptoms, the district court accepted the word of a defendant [i.e., Dr. Wolfe], who was speaking as an 'expert,' that the treatment Rowe received was adequate and effective. Had an expert been appointed, the expert would have confirmed Rowe's factual representations, and would have supported Rowe's objection that the defendant lacks personal knowledge about the condition(s) Rowe had because Wolfe never physically examined Rowe or had diagnostic testing done on Rowe" (citations omitted).

Rowe's allegations alone were sufficient to preclude summary judgment, and were enhanced by the defendants' own evidence, which included both Wolfe's contradictory evidence (among other things, he asserted that Rowe does not need Zantac and yet prescribed it for him) and the absurd opinion by the medical director that over-the-counter medications should not be provided to prisoners. Allowing Wolfe to be an expert witness in the case despite his being a defendant and not practicing the medical specialty at issue was another boost to the plaintiff's case, though again not one that an unrepresented, indigent prisoner could exploit.

We are coming to the end of this long opinion but we need to change gears for a moment: Besides arguing deliberate indifference to a serious medical need, Rowe accuses several of the defendants, in particular Dr. Wolfe and Nurse Bagienski, of retaliating against him for filing a lawsuit. He says they told him that going without Zantac for a month would make him "think twice about bringing lawsuits about inadequate medical care." If indeed they said this—an issue that cannot be determined without a trial—Rowe has a solid claim of retaliation. The retaliation claims against the other defendants were properly dismissed, however, and likewise

the deliberate-indifference claims against the following defendants, who the district court correctly found were not responsible for the failure to treat Rowe's medical condition competently—Rose Vaisvilas, Wayne Scaife, and Kenneth Hysell. But we reverse with regard to the remaining defendants and remand the case for further proceedings consistent with this opinion.

Although reversing, we are not ordering that judgment be entered in Rowe's favor. As we've explained, we are not invoking Fed. R. Evid. 201 and thus not taking judicial notice of any facts outside the district court record. The remaining defendants are entitled to try to rebut any evidence whether or not presented in the district court, including any evidence found on the Internet. Like the conventional forms of evidentiary inquiry, Internet research must be conducted with circumspection. In particular it must not be allowed to extinguish reasonable opportunities for rebuttal.

Pure adversary procedure works best when there is at least approximate parity between the adversaries. That condition is missing in this case, in which a pro se prison inmate, incapable of retaining an expert witness (expert witnesses usually demand to be paid—and how would this inmate even *find* an expert witness?), confronts both a private law firm and the state attorney general.

Because of the profound handicaps under which the plaintiff is litigating and the fact that his claim is far from frivolous, we urge the district judge to give serious consideration to recruiting a lawyer to represent Rowe, see *Miller v. Campanella*, *supra*, at *2; *Perez v. Fenoglio*, 2015 WL 4092294, at *11 (7th Cir. July 7, 2015); appointing a neutral expert witness, authorized by Fed. R. Evid. 706, to address the medical

issues in the case; or doing both. We are mindful that district courts don't have budgets for paying expert witnesses. But the medical issues in the case are not complex; there should be no difficulty in the judge's persuading a reputable gastroenterologist to speak to Rowe and some of the prison medical personnel (Rowe's prison is only 30 miles from Indianapolis, and there are 128 gastroenterologists in or near Indianapolis, *healthgrades*, www.healthgrades.com/gastroentero logy-directory/in-indiana/indianapolis), to sit for a deposition, and, if necessary, to testify. Rule 706(c)(2) states that a court-appointed expert "is entitled to a reasonable compensation, as set by the court," and that "the compensation is payable … in any … civil case [not involving just compensation under the Fifth Amendment] by the parties in the proportion and at the time that the court directs—and the compensation is then charged like other costs." In light of Rowe's indigency, the court if it appoints its own expert witness will have to order the defendants to pay the expert a reasonable fee if the expert is unwilling to work for nothing. Most prisons are strapped for cash, and this is something for the district court to bear in mind in deciding on whether and how large a fee to order the defendants to pay a court-appointed expert witness in a case (such as this case) that has sufficient merit to warrant such an appointment.

A substantial academic literature identifies serious deficiencies in the provision of health care in American prisons and jails. See, e.g., Andrew P. Wilper et al., "The Health and Health Care of US Prisoners: Results of a Nationwide Survey," 99 *Am. J. Public Health* 666 (2009), and the studies posted by the *Academic Consortium on Criminal Justice Health*, www.accjh.org/. On the quality of treatment problems of Corizon, the employer of Dr. Wolfe and the other medical

staff members sued by Rowe, see David Royse, "Medical Battle Behind Bars: Big Prison Healthcare Firm Corizon Struggles to Win Contracts," April 11, 2015, www.mod ernhealthcare.com/article/20150411/MAGAZINE/304119981; also Human Rights Defense Center, *Prison Legal News*, "Corizon Needs a Checkup: Problems with Privatized Correctional Healthcare," March 2014, www.prisonlegalnews. org/news/2014/mar/15/corizon-needs-a-checkup-problems-w ith-privatized-correctional-healthcare/. The present case illustrates the problems that this literature has identified.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

APPENDIX

We respectfully suggest that the dissenting opinion is misleading in certain respects that require a response; page references are to pages in the dissent.

Page 29: The dissenting opinion states that "the reversal is unprecedented, clearly based on 'evidence' this appellate court has found by its own internet research. … When the opinion is read as a whole, the decisive role of the majority's internet research is plain." No, the majority opinion endeavors to make clear that Rowe's allegations alone, coupled with the affidavit of Dr. Wolfe and other defense evidence, would be enough without any reference to the Internet to preclude summary judgment for the defendants, and doubtless would have precluded summary judgment had Rowe been represented. The dissent ignores this part of the majority opinion.

Page 29: The reader is told that "the majority writes that adherence to rules of evidence and precedent makes a 'heart-

less … fetish of adversary procedure.'" That is not what the majority opinion says; it says: "It is heartless to make a fetish of adversary procedure *if* by doing so feeble evidence is credited because the opponent has no practical access to off-setting evidence" (emphasis added). Nowhere does the majority opinion deny the validity of the federal rules of evidence or of procedure.

Page 32: The proposition in the dissent that the prison's response was adequate as long as it "provided at least some treatment for pain" overlooks the fact that a 150-mg Zantac pill given six and a half hours before one's next meal provides, according to Rowe, no alleviation of pain caused by stomach acid backing up into the esophagus, which is the pain of which Rowe complains. Also, it can't be correct that providing "some" treatment of pain always gets a prison doctor off the hook. Suppose Rowe were in agony from a slipped disk; would it be enough for Dr. Wolfe to give him an aspirin? To tell him, if he broke his leg, that it would heal by itself, in time?

Page 35: The statement that the majority opinion "holds in essence that the district judge erred by *not* doing such independent factual research" is mistaken. There is no such holding or suggestion in the opinion. The opinion merely suggests that the district judge should have appointed, and on remand should appoint, an expert witness who is a gastroenterologist (as Dr. Wolfe, the defendants' principal witness, is not) and who also is not a defendant.

Pages 35-36: The dissent's citation of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as a celebration of traditional adversary procedure misses the significance of *Daubert*, which is that it enlarged the role of the judge in po-

licing expert testimony. The district judge in this case failed to play the role envisaged in *Daubert* by treating Dr. Wolfe as an expert on GERD despite his being a defendant accused of neglecting Rowe's GERD and also his not being a gastroenterologist. A *Daubert* hearing would doubtless have led to his exclusion from an expert-witness role.

Page 39: The dissent says that "when a prisoner brings a pro se suit about medical care, the adversary process that is the foundation of our judicial system is at its least reliable. Few prisoners have access to lawyers or to expert witnesses needed to address medical issues." Right on! (And Rowe is not one of the few who does have the necessary access.) But affirmance of a quite possibly incorrect decision cannot be the correct solution to the problem thus correctly stated by the dissent. The majority opinion offers a modest solution—a remand to enable a competent, impartial evidentiary exploration of Rowe's claim.

Page 40: On this page the dissent repeats its contention that the majority is insisting that district judges conduct Internet research: "The majority clearly implies, while denying it is doing so, that the district judge herself should have done the independent factual research the majority has done on appeal, questioning an unchallenged expert affidavit … ." No; the district judge should have recognized the existence of a substantial issue of material fact, barring summary judgment. Rowe's evidence of pain contradicted Dr. Wolfe's affidavit.

Page 41: The dissent expresses concern that the defendants may have to pay most or all of an expert witness's fee in a case brought by an indigent prisoner, such as Rowe. But it seems unlikely that a gastroenterologist would charge more

than a nominal fee merely to testify that—what appears to be obvious—in order to prevent serious esophageal pain (and the even more serious consequences that can ensue from untreated GERD) a 150-mg Zantac pill should be taken no more than an hour before eating—not six and a half hours. One has only to read the label on a box of 150-mg Zantac pills to learn when the pill should be taken to prevent pain—30 to 60 minutes before eating. In addition, an expert's fee, if any, would in a case such as this, with its numerous defendants, be split many ways or, more likely, be paid for by the Indiana Department of Correction, the State of Indiana, Corizon or its liability insurer, or individual defendants' malpractice insurance (depending on the contractual arrangements between Corizon and the state, as well as the parties' insurance arrangements), or some combination of these well-heeled entities.

Page 42: The dissent states: "Without an expert witness qualified to present the facts and opinions the majority finds persuasive, that information does not come into evidence." This implies that without an expert witness, a party cannot defeat a motion for summary judgment. That isn't true. If a jury believed Rowe, he would win. It would be more likely to believe him than to believe Dr. Wolfe.

Page 42: The parade of horribles on this and other pages of the dissent (such as page 35, discussed earlier in this Appendix) is based on a belief that the majority is ordering that the district judge on remand do her own Internet research. Not so. It is unlikely that *any* Internet research by anyone will be necessary. All that should be necessary is testimony by a qualified, impartial expert witness who is a gastroenterologist and is not a defendant in this litigation.

Page 43: The dissent again states that we are requiring judges to conduct their own factual research. No. We are even accused by the dissent of trying to turn judges into substitutes for physicians. Again no.

Page 45: The dissent appears to misunderstand the Mayo Clinic's advice to "take one [Zantac pill] in the morning and one before bedtime." As pointed out in the majority opinion, this advice is intended "only for patients taking the prescription strengths," whereas Rowe was taking the 150-mg strength that is available over the counter. The Mayo Clinic provides different advice for the 150-mg pill: that it should be taken 30 to 60 minutes before meals to prevent heartburn symptoms (the mildest GERD symptoms). The dissent does not mention Boehringer Ingelheim's advice, also quoted in the majority opinion, that while Zantac can be taken at any time "to relieve symptoms," in order "to prevent symptoms" it should be taken "30 to 60 minutes before eating food or drinking beverages that cause heartburn." That is, if you have pain, you take a pill right away to alleviate the pain; if you foresee pain as a result of eating or drinking, you take the pill before you eat or drink—but not six and a half hours before.

Page 45: The dissent's reference to taking Zantac for more than "two weeks" without a doctor's permission is irrelevant to the case because Rowe had a doctor's permission—indeed Dr. Wolfe's permission—to take Zantac and had begun taking it long ago, always with permission.

Page 45: The reference to symptomatic relief beginning "24 hours" after taking Zantac could be understood to mean that Zantac can prevent pain that far in advance. Not so. As explained in the majority opinion, "24 hours" is the time it

takes for Zantac *when first taken* to begin to have a therapeutic effect.

ROVNER, *Circuit Judge*, concurring.

A disagreement about the outcome of this relatively simple case has morphed into a debate over the propriety of appellate courts supplementing the record with Internet research. To be clear, I do not believe that the resolution of this case requires *any* departure from the record: as the majority opinion makes patently clear, Rowe has consistently maintained that he experiences hours of severe pain if he does not take Zantac with his meals, and at this stage of the proceedings his assertions of extreme pain must be credited. See *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 696 (7th Cir. 2011). Given that, I think this case can be decided on the fundamental and unremarkable rule that we give Rowe the benefit of all conflicts and draw all reasonable inferences in his favor as the nonmoving party. *E.g., Keller v. United States*, 771 F.3d 1021, 1022 (7th Cir. 2014). Dr. Wolfe, himself a defendant, cursorily asserted that the timing ought not to matter. But Dr. Wolfe's self-interested "expert" opinion on this fact is disputed by Rowe's own personal experience with the timing of the medication, as the majority makes clear. If he informed prison officials that he was in severe pain because he could not take his medication at particular times and they did nothing about it because they did not care about his pain, that is the very definition of deliberate indifference. *See Greeno v. Daley*, 414 F.3d 645, 653-54 (7th Cir. 2005); *Walker v. Benjamin*, 293 F.3d 1030, 1039-40 (7th Cir. 2002).

Treating the competing claims of Dr. Wolfe and Rowe as disputed at the summary judgment stage is *hardly* holding that a prisoner's dissatisfaction with his treatment is always enough to require a jury trial on whether the prison's medical staff were deliberately indifferent to his pain (dissent at 32). Instead, I believe it falls more comfortably into the category the dissent

itself recognizes (dissent at 32-33)—those cases in which prisoners have shown that medical staff persisted in an obviously inadequate course of treatment. *E.g., Arnette v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (prescribing inadequate pain medication for condition causing pain and swelling in joints); *Berry v. Peterman*, 604 F.3d 435, 441-42 (7th Cir. 2010) (prescribing over-the-counter medications that did not relieve pain of severe toothache ultimately necessitating root canal); *see also Greeno*, 414 F.3d at 649-54 (continuing to provide ineffective antacid treatment for severe heartburn). Rowe argued in the district court that he needed an expert precisely because his medical condition is "complicated" and "can appear to be non-serious to a lay person." The district court denied Rowe's motion to appoint an expert, which left Rowe with only his own testimony to counter Dr. Wolfe. That the manufacturer's website and other reputable medical web sites support the plausibility of his testimony merely illuminates the factual dispute that exists within the record as we received it; they are not necessary to the outcome. Although the standard for deliberate indifference is high, I have no trouble at this stage of the litigation giving Rowe the benefit of the doubt.

HAMILTON, *Circuit Judge*, concurring in part and dissenting in part.

I agree with the majority's disposition of most claims and issues: affirming summary judgment for defendants on several claims and reversing on Rowe's retaliation claim and his claim for complete denial of his Zantac medicine for 33 days in July and August 2011.

I must dissent, however, from the reversal of summary judgment on Rowe's claim regarding the timing for administering his medicine between January and July 2011 and after August 2011. On that claim, the reversal is unprecedented, clearly based on "evidence" this appellate court has found by its own internet research. The majority has pieced together information found on several medical websites that seems to contradict the only expert evidence actually in the summary judgment record. With that information, the majority finds a genuine issue of material fact on whether the timing of Rowe's Zantac doses amounted to deliberate indifference to a serious health need, and reverses summary judgment. (The majority denies at a couple of points that its internet research actually makes a difference to the outcome of the case, see ante at 14, 16, but when the opinion is read as a whole, the decisive role of the majority's internet research is plain.)

The majority writes that adherence to rules of evidence and precedent makes a "heartless … fetish of adversary procedure." Yet the majority's decision is an unprecedented departure from the proper role of an appellate court. It runs contrary to long-established law and raises a host of practical problems the majority fails to address.

To explain my disagreement, Part I reviews the facts in the record before us and shows that the majority has actually based its decision on its internet research. Part II explains why the majority's reliance on its own factual research is contrary to law. Part III addresses the practical problems posed by the majority's decision to do its own factual research. Finally, Part IV points out problems with the reliability of the majority's factual research and shows that the enterprise of judicial factual research is unreliable when it loses the moorings to the law of judicial notice.

I. *The Facts in the Record*

On Rowe's claim that the timing of his Zantac doses showed deliberate indifference to his health, the evidence *in the record* consists of two items. First, plaintiff Rowe asserts in his verified complaint and in several affidavits that he believes the prison's schedule for giving him two 150 mg Zantac pills each day left him in unnecessary and avoidable pain for hours every day after meals. Second, defendants filed an affidavit from defendant Dr. William Wolfe, who was a career physician in the United States Air Force and is now a contract physician for the Indiana Department of Correction. Dr. Wolfe testified: "It does not matter what time of day Mr. Rowe receives his Zantac prescription. Each Zantac pill is fully effective for twelve hour increments. Zantac does not have to be taken before or with a meal to be effective. Providing Mr. Rowe with Zantac twice daily as the nursing staff makes their medication rounds, whatever time that may be, is sufficient and appropriate to treat his heart burn symptoms."

The record thus shows a prisoner's diagnosed disease and complaints of pain that prison staff treated with an ap-

propriate medicine. The prisoner is not satisfied with details of the treatment's timing, but a physician testified that the timing change the prisoner wanted was not called for because the medicine was equally effective as long as he was receiving two doses per day. This evidence does not support a reasonable inference of deliberate indifference.

Proof of deliberate indifference is much more demanding than proof of even medical malpractice. E.g. *Petties v. Carter*, — F.3d —, 2015 WL 4567899 (7th Cir. July 30, 2015); *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013); *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008); see generally *Estelle v. Gamble*, 429 U.S. 97 (1976). This record evidence would not let a reasonable jury find that the prison's schedule for giving Rowe his medicine departed so far from professional standards to find that any prison staff acted with deliberate indifference to his health. The district court therefore properly granted summary judgment for defendants on this claim. See, e.g., *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (reversing denial of summary judgment), citing *Estate of Cole v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996) (affirming summary judgment); see also, e.g., *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (affirming summary judgment; physician's refusal to order MRI for prisoner's back pain did not show deliberate indifference).

As noted above, the majority claims twice that its decision does not actually depend on its independent factual research, at pages 14 and 16. See also ante at 27–28 (Rovner, J., concurring). These denials contradict the rest of the majority opinion. If they were accurate, the majority's long discussion of its research and its justifications for it would amount to a long essay not necessary to the court's decision. If the denials

were accurate, moreover, the majority decision would amount to a significant rewriting of the Eighth Amendment law governing health care for prisoners.

Where prison medical staff just refuse to treat serious pain or disease, a prisoner may well have a viable claim that should go to trial. E.g., *Miller v. Campanella*, No. 14-1990,— F.3d —, 2015 WL 4523799 (7th Cir. July 27, 2015) (no treatment of prisoner's GERD); *Hayes v. Snyder*, 546 F.3d 516, 524–26 (7th Cir. 2014). Where the evidence shows, however, that medical staff have provided at least some treatment for pain we almost always hold that the prisoner is not entitled to a jury trial on a claim for deliberate indifference based on a claim that the pain treatment was not adequate. E.g., *Pyles v. Fahim*, 771 F.3d 403, 409, 411 (7th Cir. 2014); *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073–76 (7th Cir. 2012).

If the majority decision did not depend on its own factual research, then the majority would be holding that the prisoner's dissatisfaction with pain treatment is enough to require a jury trial on whether the prison's medical staff were deliberately indifferent to his pain. We have not found before this case that such evidence is sufficient to infer deliberate indifference. But we will see a lot more cases like this one. As the average age of the prison population increases, so will the incidence of painful, chronic conditions that cannot be treated to the complete satisfaction of the prisoners. The fact that a treatment for pain is not as effective as the prisoner would like should not be enough to support an inference that the prison staff are deliberately indifferent to his pain.

In fact, the majority's reversal on this claim is based on a small but important category of cases in which prisoners

have shown that medical staff persisted in obviously inadequate courses of treatment. In those cases, we have found triable issues of deliberate indifference. E.g., *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011); *Berry v. Peterman*, 604 F.3d 435, 441–42 (7th Cir. 2010); *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (treatment prisoner received was "blatantly inappropriate"). As we explained in *Pyles*, these decisions were based on evidence showing that the need for specialized expertise or different treatment was either known by the treating physicians or would have been obvious to a lay person. 771 F.3d at 411.

The problem for the majority here is that Rowe himself has made no comparable showing. Only by relying on its independent factual research can the majority establish an arguable basis for applying this theory that the course of treatment was so clearly inadequate as to amount to deliberate indifference. The majority decision to reverse summary judgment on this claim thus depends on that independent factual research.

II.  *The Law on Judicial Research into the Facts*

The ease of research on the internet has given new life to an old debate about the propriety of and limits to independent factual research by appellate courts.[1] To be clear, I do not

---

[1] See, e.g., Layne S. Keele, *When the Mountain Goes to Mohammed: The Internet and Judicial Decision-Making*, 45 N.M. L. Rev. 125 (2014); Allison Orr Larsen, *The Trouble with Amicus Facts*, 100 Va. L. Rev. 1757 (2014); Richard A. Posner, *Judicial Opinions and Appellate Advocacy in Federal Courts—One Judge's Views*, 51 Duq. L. Rev. 3 (2013); Frederick Schauer, *The Decline of "The Record": A Comment on Posner*, 51 Duq. L. Rev. 51 (2013); Elizabeth G. Thornburg, *The Lure of the Internet and the Limits on Judicial Fact Research*, Litig., Summer 2012, at 41; Brianne J. Gorod, *The*

oppose using careful research to provide context and background information to make court decisions more understandable. By any measure, however, using independent factual research to find a genuine issue of material, adjudicative fact, and thus to decide an appeal, falls outside permissible boundaries. Appellate courts simply do not have a warrant to decide cases based on their own research on adjudicative facts. This case will become Exhibit A in the debate. It provides, despite the majority's disclaimers, a nearly pristine example of an appellate court basing a decision on its own factual research.

The majority's factual research runs contrary to several lines of well-established case law holding that a decisionmaker errs by basing a decision on facts outside the record.

If a district judge bases a decision on such research, we reverse for a violation of Rule 201. E.g., *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 648–51 (7th Cir. 2011) (district court erred by relying on independent internet research on attorney fees without giving parties opportunity to address information).

If jurors start doing their own research during a trial, a new trial is likely. *United States v. Thomas*, 463 F.2d 1061, 1062–65 (7th Cir. 1972); see also *United States v. Blagojevich*, 612 F.3d 558, 564 (7th Cir. 2010) (noting concern that messag-

---

*Adversarial Myth: Appellate Court Extra-Record Factfinding*, 61 Duke L.J. 1 (2011); Elizabeth G. Thornburg, *The Curious Appellate Judge: Ethical Limits on Independent Research*, 28 Rev. Litig. 131 (2008); Coleen M. Barger, *On the Internet, Nobody Knows You're a Judge: Appellate Courts' Use of Internet Materials*, 4 J. App. Prac. & Process 417 (2002).

es to jurors would tempt them to engage in "forbidden research and discussion").

If an immigration judge or administrative law judge bases a decision on facts without record support, we reverse it. See, e.g., *Huang v. Gonzales*, 403 F.3d 945, 948–50 (7th Cir. 2005) (reversing immigration decision based on alien's answers to questions based on judge's personal beliefs about alien's religion); *Nelson v. Apfel*, 131 F.3d 1228, 1236–37 (7th Cir. 1997) (ALJ's reliance on evidence outside record was erroneous but harmless).

We are in no better a position to go outside the record for decisive facts. Our job is to reverse in cases where the decision-maker has gone outside the record. The majority in this case, however, not only does what we treat as reversible error when others do it; it holds in essence that the district judge erred by *not* doing such independent factual research. What was forbidden is now required.

In addition to the case law holding that a decision-maker is not permitted to base a decision on evidence outside the record, another body of law is relevant to this issue: Federal Rule of Evidence 201 and the law of judicial notice. The majority opinion runs contrary to that law and misunderstands how Rule 201 and judicial notice fit together with the ordinary, adversarial presentation of facts.

The vast majority of facts that courts consider when deciding cases comes from the familiar, adversarial presentations of evidence by opposing parties. The foundation of our legal system is a confidence that the adversarial procedures will test shaky or questionable evidence: "Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). Those protective procedures are not available when a court decides to do its own factual research and bases its decision on what it finds.

The law of evidence allows a narrow exception permitting some judicial research into relevant facts, under Federal Rule of Evidence 201 and the concept of judicial notice. Judicial notice "substitutes the acceptance of a universal truth for the conventional method of introducing evidence," and as a result, courts must use caution and "strictly adhere" to the rule before taking judicial notice of pertinent facts. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997); see also *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) ("In order for a fact to be judicially noticed, indisputability is a prerequisite.").

The majority says twice it is *not* taking judicial notice of all the cited medical information from the internet. Ante at 13–14, 19. I agree it could not properly take judicial notice of this information under Evidence Rule 201(b) and (e). The proper timing of a patient's doses of Zantac is not "generally known within the trial court's territorial jurisdiction" and is not beyond "reasonable dispute," nor can it be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," as Rule 201(b) requires. And the majority has made no effort to comply with the procedural requirements of Rule 201(e), essential to basic fairness, of giving the parties an opportunity to be heard on the evidence.

If the majority is not taking judicial notice, what exactly is it doing? It seems to have created an entirely new, third category of evidence, neither presented by the parties nor properly subject to judicial notice. The majority writes:

> When medical information can be gleaned from the websites of highly reputable medical centers, it is not imperative that it instead be presented by a testifying witness. *Such information tends to fall somewhere between facts that require adversary procedure to determine and facts of which a court can take judicial notice*, but it is closer to the second in a case like this in which the evidence presented by the defendants in the district court was sparse and the appellate court need only determine whether there is a factual dispute sufficient to preclude summary judgment.

Ante at 13 (emphasis added). In other words, the majority acknowledges that its "evidence" neither comes from adversarial presentation by the parties nor meets the strict substantive and procedural standards for judicial notice under Rule 201.

Before this decision, American law has not recognized this category of evidence, which might be described as "non-adversarial evidence that the court believes is probably correct." Compare the comments of the authors of Rule 201, the Advisory Committee Notes from 1972:

> The usual method of establishing adjudicative facts is through the introduction of evidence, ordinarily consisting of the testimony of wit-

nesses. If particular facts are outside the area of reasonable controversy, this process is dispensed with as unnecessary. *A high degree of indisputability is the essential prerequisite.*

In other words, the Federal Rules of Evidence allow no room for the majority's innovation. Adversarial evidence and judicial notice are not opposite poles on a wide spectrum, with a middle ground for the majority's evidence that has neither been subjected to adversarial testing nor a proper subject of judicial notice. These are two distinct categories. To be admissible, evidence must fall within one or the other. "Close" to judicial notice does not count.

The majority has not offered any precedent from the law of evidence to support its reliance on its own factual research. Instead, it tries to downplay the unprecedented step it takes, including its emphasis that it is "not ordering that judgment be entered in Rowe's favor" and that defendants will be entitled to rebut the majority's factual research on remand. Ante at 19. The majority's modest demurrer loses sight of the stakes. The issue on summary judgment is whether the evidence *in the record* would allow a reasonable jury to find in favor of the non-moving party. See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149–50 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). By reversing, the majority is necessarily finding that this record is sufficient to support a jury verdict for Rowe. I disagree.

The majority also points out that "judges and their law clerks often conduct research on cases without disclosure to the parties." Ante at 12. Such research has long been understood to involve only *legal research*. The majority's effort to compare long-accepted judicial research into case law and

statutes to its independent *factual* research shows the majority has entered unknown territory.

To justify this venture, the majority asks a number of rhetorical questions and invokes the courage of the barons at Runnymede in 1215. Ante at 14. With respect, we are an intermediate appellate court. The Federal Rules of Evidence and Federal Rules of Civil Procedure that we apply are adopted and amended through processes established by the Rules Enabling Act, 28 U.S.C. § 2071 et seq. We simply do not have authority on our own to take the law into this unknown territory.

III. *The Practical Problems*

The majority points out correctly that prisoners must depend entirely on the government for their health care. If they turn to the federal courts for help, the combination of the constitutional standard under the Eighth Amendment, deliberate indifference to a serious health need, and the system of personal liability under 42 U.S.C. § 1983 can make it very difficult for a prisoner to hold anyone accountable for serious wrongs. See, e.g., *Shields v. Illinois Dep't of Corrections*, 746 F.3d 782 (7th Cir. 2014). When a prisoner brings a pro se suit about medical care, the adversary process that is the foundation of our judicial system is at its least reliable. Few prisoners have access to lawyers or to expert witnesses needed to address medical issues.

These conditions pose important challenges to federal courts doing their best to decide these cases fairly. Yet the majority's solution—to research available medical information on its own and find a genuine issue of material fact

on that basis—raises problems much more serious than a possible error in the resolution of one prisoner's case.

The majority's approach turns the court from a neutral decision-maker into an advocate for one side. The majority also offers no meaningful guidance as to how it expects other judges to carry out such factual research and what standards should apply when they do so. Under the majority's approach, the factual record will never be truly closed. This invites endless expansion of the record and repetition in litigation as parties contend and decide that more and more information should have been considered.

In addition to the abandonment of neutrality, consider the problems from the district judge's point of view. The majority clearly implies, while denying it is doing so, that the district judge herself should have done the independent factual research the majority has done on appeal, questioning an unchallenged expert affidavit by looking to websites of the drug manufacturer, the Mayo Clinic, the Physician's Desk Reference, and Healthline.

The practical questions are obvious: When are district judges supposed to carry out this independent factual research? How much is enough? What standards of reliability should apply to the results? How does the majority's new category of evidence fit in with a district judge's gatekeeping responsibilities under Rule 702 and *Daubert*? The majority offers no answers.

The majority essentially orders the district judge on remand to find an expert witness on the medical issues, either for plaintiff or as a neutral expert under Rule 706. That might well be helpful, but as the majority concedes, district

courts do not have budgets for that purpose. Even if a few experts might be willing to volunteer in unusual cases, the demand of prisoners for free medical or other expert witnesses will far exceed the supply, especially in the rural areas where so many prisons are located and smaller towns where the nearest district courts are located.

The majority's solution for this problem is to have the district court use Federal Rule of Evidence 706 to order defendants, and only the defendants, to pay for an expert witness for the plaintiff or the court. See ante at 19–20. That approach is not foreclosed by the language of Rule 706, and there is some case law supporting it. See *Ledford v. Sullivan*, 105 F.3d 354, 360–61 (7th Cir. 1997). Nevertheless, the majority's reliance on this solution in this ordinary case further threatens the neutrality of the courts. It is worth recalling that damages under 42 U.S.C. § 1983 must be sought from state employees only in their individual capacities. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989). Indemnification by their employer is a matter of state law and policy, and sometimes grace. See Ind. Code § 34-13-4-1; *Estate of Moreland v. Dieter*, 576 F.3d 691, 694–96 (7th Cir. 2009). Is it fair to impose on individual guards, prison administrators, staff, nurses, and doctors the cost of finding evidence to build a case against them? At the very least, such one-sided burdens should be imposed only in extraordinary cases.[2]

---

[2] I share the concerns expressed by the district court in *Martin v. Cohn*, 1999 WL 325054, at *1 (N.D. Ind. April 5, 1999), about the fundamental fairness of imposing this financial burden on one side solely because the opposing party is indigent. The defendants will end up having to foot the bill for the expert even if they win the case. One partial but creative solution to this problem can be found in *Goodvine v. Ankarlo*,

Further, if the case goes to trial, how is the district judge supposed to present to a jury the information the majority has found? My colleagues and I agree it is not suitable for judicial notice because it is not indisputable, as required under Rule 201(b). Without an expert witness qualified to present the facts and opinions the majority finds persuasive, that information does not come into evidence. On appeal would the majority's approach lead us to remand for a new trial with instructions to look harder for the right evidence? Or what should we do if the district judge did not find or rely on the information that our research turns up? As long as the factual record remains open for judicial supplements, parties will try to use the quest for the perfect record to keep any loss in litigation from being final.

Then consider the problems parties and their lawyers will face. If we permit such independent factual research by district judges—even *expect* such research from them—parties will need to plan for it. Responding to the evidence actually offered by the other side is often the biggest challenge and expense in a lawsuit. Now parties need to anticipate the evidence the judge might turn up on her own and prepare to meet it. The time and expense devoted to such preventive measures will be substantial and should be unnecessary. And if the district judge does her own research and gives the parties an opportunity to respond to it, the majority's approach here is an open invitation for parties to add to the record on appeal. The parties will also need to anticipate on appeal that our court will undertake its own factual

2013 WL 1192397, at *2 (W.D. Wis. March 22, 2013) (providing for long-term assessments of plaintiff's prison trust account to pay for court-appointed expert if plaintiff did not prevail).

research, opening up opportunities to save any losing case by offering new evidence on appeal.[3]

From the larger perspective of our judicial system, the independent factual research the majority endorses and even requires here is not something that federal courts can carry out reliably on a large scale. History is probably the academic field closest to the practice of law and judging. Yet historians regularly scoff at the phenomenon called "law-office history." See *Velasquez v. Frapwell*, 160 F.3d 389, 393 (7th Cir. 1998) (Posner, J.) ("[J]udges do not have either the leisure or the training to conduct *responsible* historical research or *competently* umpire historical controversies. The term 'law-office history' is properly derisory and the derision embraces the efforts of judges and law professors, as well as of legal advocates, to play historian. * * * Judges don't try to decide contested issues of science without the aid of expert testimony, and we fool ourselves if we think we can unaided resolve issues of historical truth."), *vacated in part*, 165 F.3d 593 (7th Cir. 1999).

Law-office or judicial-chambers medicine is surely an even less reliable venture. The internet is an extraordinary resource, but it cannot turn judges into competent substitutes for experts or scholars such as historians, engineers,

---

[3] If parties on appeal try to supplement the record as the majority does here, they are rebuked and may even be sanctioned. E.g., *Hart v. Sheahan*, 396 F.3d 887, 894–95 (7th Cir. 2005) (stating general rule but finding no violation because appeal was from dismissal on pleadings); *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1392 n.4 (7th Cir. 1990) (striking portions of appellee's brief). Under the majority's approach, we could not take such steps in response to parties' invitations to our court to repeat what the majority does here.

chemists, psychologists, or physicians. The majority's instruction to the contrary will cause problems in our judicial system more serious than those it is trying to solve in this case.

IV. *How Reliable is Our Research?*

Thus far I have avoided debating the details of the majority's research, but they deserve closer attention. The specific details highlight the more general criticisms I have directed at such factual research by judges.

First, on the websites the majority relies upon, we find important disclaimers that emphasize the need for filtering their information through qualified medical advice, which no member of this court is qualified to provide. The Physician's Desk Reference site says it is to be used "only as a reference aid. It is not intended to be a substitute for the exercise of professional judgment. You should confirm the information on the PDR.net site through independent sources and seek other professional guidance in all treatment and diagnosis decisions." www.pdr.net (last visited August 19, 2015, as were all websites cited here). The Mayo Clinic and Zantac websites have similar disclaimers advising readers to talk to a physician or other health care provider before acting on the information on the websites. See www.mayoclinic.org/about-this-site/terms-conditions-use-policy; www.zantacotc.com/zantac-maximum-strength.html#faqs.

Second, after we get past the disclaimers, the content of the majority's websites simply does not give clear support to the majority's views (a) that Dr. Wolfe was wrong in saying that the 150 mg pills Rowe was receiving twice a day could

be equally effective even if not given shortly before meals, let alone (b) that Dr. Wolfe was *so thoroughly and obviously* wrong that a jury could infer that prison staff were deliberately indifferent to Rowe's health needs. The majority's websites instead show that some degree of medical judgment is needed to decide when best to administer which size pills for patients with different needs, especially patients like Rowe with chronic conditions.

The Mayo Clinic site says that patients taking prescription strength Zantac twice a day should take one in the morning and one at bedtime. The majority discounts that advice because Rowe was taking an over-the-counter dosage of 150 mg pills rather than the prescription dosage of 300 mg pills. Ante at 8. Yet that explanation overlooks the advice from both the manufacturer and the Mayo Clinic that a patient should not take the over-the-counter pills for more than two weeks *unless directed by a doctor*. For patients like Rowe, taking Zantac long-term to treat GERD, the Mayo Clinic offers more specific guidance. It advises that adult patients with GERD take the 150 mg pill two times a day without specifying that the pills should be taken shortly before meals. www.mayoclinic.org/drugs-supplements/histamine-h2-antagonist-oral-route-injection-route-intravenous-route/proper-use/drg-20068584. That advice from the Mayo Clinic seems identical to Dr. Wolfe's view.

Similarly, the PDR advises that for treatment of GERD, "Symptomatic relief commonly occurs within 24 hours after starting therapy with ZANTAC 150 mg twice daily," again without indicating any need to take the pills before meals. www.pdr.net/full-prescribing-information/zantac-150-and-300-tablets?druglabelid=241#section-standard-1.

The "full prescribing information" on the Physician's Desk Reference website says that for treatment of GERD with the 150 mg and 300 mg pills, "Symptomatic relief commonly occurs within 24 hours after starting therapy with ZANTAC 150 mg twice daily," again without saying anything about taking pills before meals. www.pdr.net/full-prescribing-information/zantac-150-and-300-tablets?druglabelid=241. And again, that was Rowe's diagnosis and those were his pills in 2011.

The majority draws on the PDR website and "common sense" regarding how long the pills remain effective. Ante at 17. The PDR website, however, simply does not provide sufficient data on absorption and clearance rates for the medicine to allow us to exercise our own (non-expert) judgment about whether the timing of Rowe's pills was appropriate. It certainly does not allow us to conclude that the timing could have amounted to deliberate indifference to his serious health needs or to find that Dr. Wolfe's uncontradicted affidavit did not support the district court's entry of summary judgment on this claim.

Of course, the point of this discussion of the websites is not to debate the majority on the medical fine points. The websites the majority relies upon tell us themselves that their information needs to be interpreted by a qualified physician. None of this information is in the record. None was before the district court, nor is it properly before us.

The majority's interpretation of its internet research is not a reliable substitute for proper evidence subjected to adversarial scrutiny. And while Dr. Wolfe's affidavit is far less detailed than the information the majority has explored on the internet, I also see no basis for the majority's harsh criticism

of him, especially when Dr. Wolfe has not been given any opportunity to respond or explain.[4]

*   *   *

In the end, whether Dr. Wolfe's testimony about the timing for Rowe's doses was right or wrong in some pure and objective sense, or in a case tried with ample resources and talent on both sides, is not the question for us. For purposes of summary judgment, Dr. Wolfe's testimony was undisputed. We have no business reversing summary judgment based on our own, untested factual research. By doing so, the majority has gone well beyond the appropriate role of an appellate court. I respectfully dissent from the reversal of summary judgment on Rowe's claims based on the timing of his medication.

---

[4] The majority criticizes Dr. Wolfe's affidavit for not providing an explanation for his opinion about the timing of the Zantac doses. The majority overlooks Federal Rule of Evidence 705, which permits conclusory expert testimony unless and until the conclusions are challenged, which Dr. Wolfe's affidavit was not in the district court. He has not yet been called upon to explain his opinion in this case. The fact that he is a defendant does not disqualify him from offering an affidavit; we often affirm summary judgment based on a moving party's testimony. The majority points out that Dr. Wolfe is "a frequent defendant in prisoner civil rights suits," ante at 6, as if that reflected poorly on his professionalism. Virtually any physician serving large numbers of prisoners will be "a frequent defendant in prisoner civil rights suits."